STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-301


BRADLEY DAY & TRACEY DAY

VERSUS

ELVIS DEAN THOMPSON, ET AL.


**********


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2017-4574
HONORABLE DERRICK D. KEE, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**CHIEF JUDGE**

**********

Court composed of Elizabeth A. Pickett, Van H. Kyzar, and Jonathan W. Perry, Judges.


**AFFIRMED.**


**Randall A. Smith**
**J. Geoffrey Ormsby**
**Smith & Fawer, L.L.C.**
**201 St. Charles Avenue, Suite 3702**
**New Orleans, LA 70170**
**(504) 525-2200**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **Prime Insurance Company**

**Frank X. Neuner, Jr.**
**Jennifer M. Ardoin**
**Katelyn B. Courville**
**NeunerPate**
**One Petroleum Center, Suite 200**
**1001 West Pinhook Road**
**Lafayette, LA 70503**
**(337) 237-7000**
**COUNSEL FOR DEFENDANTS-APPELLANTS:**
    **Elvis Dean Thompson**
    **Terry Graham Trucking, Inc.**

**John Craig Jones**
**Craig R. Hill**
**Jones & Hill, LLC**
**131 Hwy 165 South**
**Oakdale, LA 71463**
**(318) 335-1333**
**COUNSEL FOR PLAINTIFFS-APPELLEES:**
    **Bradley Day**
    **Tracey Day**

**PICKETT, Chief Judge.**

Elvis Thompson, Terry Graham Trucking, Inc., and Prime Insurance Company appeal the judgment of the trial court awarding damages to Tracey and Bradley Day.

## FACTS

On March 31, 2017, Mr. Thompson was operating an 18-wheeler on I-210 in Calcasieu Parish when he struck the rear of a vehicle driven by Tracey Day. Mrs. Day's vehicle then struck a vehicle driven by Teresa Jeffries. Mrs. Day and her husband, Bradley, filed suit against Mr. Thompson, Terry Graham Trucking, Inc., (Graham Trucking) the owner of the eighteen-wheeler and employer of Mr. Thompson, and Graham Trucking's insurer, Prime Insurance Company. Mrs. Day alleged she sustained serious injuries as a result of the collision, and Mr. Day claimed a loss of consortium. The Days' suit was consolidated with a suit filed by Ms. Jeffries and another suit arising from the same incident but was later severed just before the Jeffries' claim went to trial on October 7, 2019.[1]

The trial on the Days' claims was set for September 20, 2021. In early September, counsel for Prime Insurance filed a motion to continue because he had been displaced as a result of Hurricane Ida, which made landfall on August 29, 2021. The Days did not oppose Prime Insurance's motion for a continuance at a telephone status conference but did ask the court not to allow any further discovery. The matter was reset for January 3, 2022. After the trial court issued a standard scheduling order for the reset trial date, the Days filed a motion to amend the order to reflect the court's ruling that there would be no further discovery beyond what had already been

---

[1] *See Jeffries v. Prime Insurance Co.*, 21-161 (La.App. 3 Cir. 11/3/21), 334 So.3d 761, *writs denied*, 21-1811, 21-1817 (La. 2/22/22), 333 So.3d 433.

scheduled as of the date of the continuance. At a hearing on September 15, 2021, the trial court stated:

> [L]et the record reflect that I don't intend to re-open discovery or any new experts other than the reports that are already outstanding. I don't intend to reopen that. The spirit of that conference was, we wanted to be courteous as a Court and as a profession to our colleague, Mr. Ormsby, and others who were down east who were affected by Ida. That's all. Otherwise, we would have been trying this case next Monday.

At the beginning of the jury trial on January 3, 2022, the following colloquy occurred between Mr. Jones, counsel for the Days, Mr. Green, counsel for Mr. Thompson and Graham Trucking, and the court:

MR. JONES:

First, Mrs. Tracey Day is still suffering from the injuries that her -- that she suffered in March 31st, 2017. It's very difficult for her to sit for longer than about 30 minutes or so. She gets emotional. We have taken -- the defense knows about this, they've taken her doctor's depositions. We're going to ask, Your Honor, if you would excuse her from being at the trial for the entire length of the trial. She will be here to testify, Your Honor. She is available if we should need her. But she just is – it's just a matter of discomfort, Your Honor, and, in particular, I think her psychiatrist has indicated it's just not a good idea for her to be -- even required to be here for the entire time.

MR. GREEN:

Your Honor, we would oppose that. I think part of this trial is the jury's ability to observe Mrs. Day and observe what her capabilities are, including sitting through trial and whether or not she can pay attention. It's an absolute integral part of the case, especially with it relates to her claims for future losses and lost wages.

THE COURT:

I'm going to grant the request and they'll have an opportunity to observe her when she comes in to testify.

The jury was selected on January 3, and the plaintiffs began presenting their case to the jury on January 4. At the outset of proceedings on the fifth day of trial, counsel for Prime Insurance explained that he intended to call Jody Clavier, a private

investigator, who had been engaged after Mrs. Day was excused from attending the trial. Counsel explained that the defendants were surprised by Mrs. Day's claim that she could not be in the courtroom for the entirety of the trial and hired Mr. Clavier to determine if her testimony was truthful. Mr. Clavier was sent to follow Mrs. Day, and as a result they saw Mrs. Day sitting in a BMW sedan for fifty minutes and walking her dogs for longer than five minutes. Counsel indicated that they supplemented their discovery responses at 1:45 a.m. on the morning of the hearing with the video footage taken by Mr. Clavier of Mrs. Day on January 4 and 5. Counsel asked that the court allow the admission of the surveillance video and the testimony of Mr. Clavier as impeachment evidence, citing *Detillier v. Smith*, 94-34 (La.App. 5 Cir. 5/31/94), 638 So.3d 445, *writ denied*, 94-1762 (La. 10/17/94), 644 So.2d 645.

Counsel for the plaintiffs objected to the introduction of the evidence. In addition to citing the ruling that evidence was closed at the time the trial was continued to January 3, 2022, the Days argued that the trial court had already refused to allow surveillance video and testimony from a private investigator who was hired to follow Mrs. Day after the trial court's September 15, 2021 ruling. Further, counsel for the Days argued he had not had an opportunity to examine whether the video surveillance footage was "tinkered with."

The trial court disallowed the introduction of the surveillance video and the testimony of Mr. Clavier. The defendants proffered the video surveillance footage and the testimony of Mr. Clavier.

At the conclusion of the trial, the jury found Mr. Thompson and Graham Trucking at fault for the injuries caused to Mrs. Day. The jury found Mrs. Day was

not at fault in causing her injuries. The jury awarded damages in the following amounts to Mrs. Day:

| | |
|---|---|
| Past Medical Expenses | $ 354,736.17 |
| Future Medical Expenses | $ 500,000.00 |
| Past Lost Wages | $ 82,113.00 |
| Future Lost Wages | $ 165,000.00 |
| Past Physical Pain and Suffering | $1,400,000.00 |
| Future Physical Pain and Suffering | $ 700,000.00 |
| Past Mental Anguish | $ 175,000.00 |
| Future Mental Anguish | $ 175,000.00 |
| Disability | $ -0- |
| Loss of Enjoyment of Life | $ 350,000.00 |

The jury also awarded $25,000.00 to Mr. Day for loss of consortium.

The trial court signed a judgment in conformity with the jury's verdict on February 17, 2022. Prime Insurance timely filed a Partial Motion for New Trial on March 24, 2022, in which it argued that its coverage limit of $1,000,000.00 was exhausted when Prime Insurance paid $1,000,000 in the *Jeffries* matter on March 3, 2024. The trial court signed a consent judgment granting the motion for new trial as to GEICO[2] on May 16, 2023, stating "the Judgment signed on February 11, 2022 is hereby amended to remove Prime from the Judgment as the policy limits have been exhausted." The trial court also issued an amended final judgment on May 11, 2022, which restated the terms of the initial February 11, 2022 judgment but removed the terms casting Prime in judgment, with the exception of casting Prime with interest on the first million dollars of the judgment from the date of judicial demand and costs of the trial until March 3, 2022, when the policy limits were exhausted. Prime Insurance then perfected a suspensive appeal, and Graham Trucking and Mr. Thompson perfected a devolutive appeal.

---

[2] GEICO issued a UM policy to Mrs. Day, and was named in the original petition for damages.

## ASSIGNMENTS OF ERROR

On appeal, Prime Insurance has filed a brief and Graham Trucking and Mr. Thompson have filed a brief. Both briefs assert the same two assignments of error:

1.    The trial court erred in refusing to allow Defendants to present surveillance video footage of Plaintiff/Appellee Tracey Day obtained during trial as impeachment evidence, which resulted in prejudicial— not harmless—error.

2.    The trial court erred in excluding the testimony of Appellants' impeachment and/or rebuttal witness, Jody Clavier, the private investigator who personally observed Plaintiff/Appellee Tracey Day during trial and obtained the excluded surveillance video footage.

Graham Trucking and Mr. Thompson also filed a motion seeking to strike certain portions of the Days' brief to the extent that there are references to the first surveillance video that they allege are not in the record on appeal. Prime Insurance filed a motion to adopt the motion to strike. The motion to strike was referred to the merits of this appeal.

## DISCUSSION

*Motion to Strike*

Graham Trucking and Mr. Thompson seek to strike two sections of the Days' brief, arguing that they describe the events on the surveillance video, which was not in the appeal record. The record reflects that a disc with the video was proffered at the December 15, 2021 hearing by the attorney for Graham Trucking and Mr. Thompson as Exhibit 4 to Plaintiff's Sixth Motion in Limine. At the time the motion to strike was filed, the disc itself was not included in the appeal record, though a photocopy of the disc appears in the record. The record in this court was supplemented to include the actual disc after the motion to strike was filed.

5

Because the surveillance was properly made a part of the record in the trial court and is included in the record on appeal, we find no merit in the motion to strike, and it is denied.

*Admission of Surveillance Video and Related Testimony*

The defendants argue that the trial court erred in refusing to admit either the surveillance video taken during the trial or the testimony of the investigator hired to surveil Mrs. Day during the trial. The defendants argue that the evidence, if allowed, would show that Mrs. Day was able to sit for longer than thirty minutes or walk her dogs for longer than five minutes, as she testified at trial. The defendants argue that the first video taken by Mr. Clavier on January 4, 2022, which is less than two minutes in duration, shows Mrs. Day sitting in a car in a parking lot for fifty minutes. The defendants argue that the second video taken by Mr. Clavier on January 5, 2022, which is less than nineteen minutes long, shows Mrs. Day walking her dogs for over fifty minutes.

The defendants cite *Detillier*, 638 So.2d 445, to support their argument that surveillance video taken during the trial can be used to impeach the testimony of Mrs. Day. In that case, the trial court admitted surveillance video of the plaintiff taken during the trial showing the plaintiff moving her head in a way she claimed she could not. The trial court allowed the jury to view the video and allowed the investigator who made the video to testify about what he saw. The video showed the plaintiff removing her cervical collar, moving her head from side to side, tilting her head back, and sipping on a drink.

The pretrial order in *Detillier* did not require disclosure of documentary impeachment evidence. Further, the plaintiff did not submit an interrogatory in discovery regarding any surveillance footage of the plaintiff or a request for

production of any video footage of the plaintiff. The fifth circuit found this failure to seek such discovery relevant to the inquiry in *Detillier*, stating:

> Thus, if plaintiff had submitted a discovery interrogatory regarding the existence of videotapes of her, or a specific request for production of such, then even if no videotape existed prior to trial defendants would have been required to supplement their response to inform plaintiff when the videotape was made. La.Code Civ.P. art. 1428. Failing any such request by plaintiff, any pretrial surveillance videos would have been admissible as impeachment evidence without notice to plaintiff.

> In other words, even if the defense had made a surveillance video six months or a year prior to trial, plaintiff would not have discovered it in advance because plaintiff never sought such in pretrial discovery. Any video made would have been a surprise to plaintiff. Under the circumstances, therefore, we cannot find error in the admission of the surveillance video made after trial had begun. Accordingly, we agree with the trial court that, under the circumstances here, the video made during the course of trial was admissible. *See Guillot v. Miller*, 580 So.2d 1104, 1106–1107 (La.App. 4th Cir.1991).

*Id.* at 449.

The case before us is distinguishable from *Detillier*. The Days propounded both interrogatories and requests for production of documents to Prime Insurance seeking information on surveillance video taken of Mr. or Mrs. Day and production of the video. The Days also propounded an interrogatory on Graham Trucking and Mr. Thompson seeking information regarding surveillance of Mr. and Mrs. Day.

The admission of extrinsic evidence attacking a witness's credibility is governed by La.Code Evid. art. 607(D)(2), which states:

> Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

In *Olivier v. LeJeune*, 95-53, p. 10 (La. 2/28/96), 668 So.3d 347, 351, the supreme court explained the trial court's role in determining the admissibility of surveillance video evidence:

> "The determination of whether motion pictures or video tapes are admissible is largely within the discretion of the trial court." *Lafleur v. John Deere Co.*, 491 So.2d 624, 632 (La.1986). As previously noted in the context of a worker's compensation case,
>
> > evidence in the form of moving pictures or videotapes must be approached with great caution because they show only intervals of the activities of the subject, they do not show rest periods, and do not reflect whether the subject is suffering pain during or after the activity.
>
> *Orgeron v. Tri–State Road Boring, Inc.*, 434 So.2d 65, 68 (La.1983).

"[T]he trial court is accorded vast discretion concerning the admission of evidence, and its decision will not be reversed on appeal absent an abuse of that discretion." *Libersat v. J & K Trucking, Inc.*, 00-192, p. 11 (La.App. 3 Cir. 10/11/00), 772 So.2d 173, 179, *writ denied*, 01-458 (La.4/12/01), 789 So.2d 598.

In *Woolford v. JoEllen Smith Psychiatric Hospital*, 96-2460, pp. 5–6 (La. 5/20/97), 693 So.2d 1164, 1167–68 (footnote omitted), the supreme court set forth a rule for the timing of the production of surveillance video during pre-trial discovery:

> The general rule is that the plaintiff's deposition precede the production of the surveillance videotape, absent a showing by the plaintiff of special circumstances. This rule best serves the overarching purpose of our system of justice—to search for the truth. Ours is an adversarial system of justice that relies on the ability and resources of adversaries to uncover the truth by testing each other's evidence through a variety of methods, the most important of which is cross-examination. Moreover, in an adversarial system, the defendant has a right to a defense and to cross-examination. In a personal injury case, surveillance videotape can be critical to the defendant's defense and ability to effectively cross-examine the plaintiff. Surveillance materials may thus serve an important function in the search for truth and, absent special circumstances, their value should be preserved by delaying their disclosure until after the deposition of the plaintiff.

However, we recognize that surveillance videotape may not be totally reliable, that it may be taken out of context, and that it is vulnerable to manipulation through various editing techniques. For these reasons, we emphasize that although the production of surveillance videotape is to be delayed until after the plaintiff's deposition, the plaintiff is entitled to the videotape a reasonable time before trial, so as to give the plaintiff ample time to determine any weaknesses in the videotape. Our rule thus balances the defendant's need to preserve valuable potential impeachment evidence for use during cross-examination and the plaintiff's need to determine whether the videotape is authentic or misleading.

Since the surveillance video in this case was taken during trial, the precise holding of *Woolford* is inapplicable, but the rationale of the supreme court is instructive. The Days argued that the admission of the surveillance video taken by Mr. Clavier would necessitate a delay of the trial to test the authenticity of the footage contained thereon.

In ruling on the motion to exclude the surveillance video and the testimony of Mr. Clavier, the trial court stated:

I understand the circumstances of the video. The defense took a risk on hiring Mr. Clavia [sic] to come in and testify and to find out this information that seems to have all kinds of things unpacked in it. What type of car they're driving, that's the kind of stuff I really wouldn't care to have before the jury anyway. For the jury to say, well, I don't want to give them money because they're driving a BMW, rather than driving a pickup or SUV. These are the kind of things that confuse the trial. It really does. And I think that there is definitely no fault on either side, not for advocacy, you're never going to get any qualms from me on that. I just think it's kind of a culture that's been created throughout at the end of this trial. And it happens, sometimes you have good relationships. I've had several trials this year, probably had more trials than any first year Judge. And I'm very proud of that, but I've seen good dealings, I've seen tough advocacy, but I'm seeing on the defense side, you guys were not satisfied with the stipulation of the other lawyer and you've been trying very, very hard to undo that stipulation. I feel as though in this case you're not satisfied with my Pretrial Order or my Pretrial Order that you cannot use the prior video and now you've gone to get subsequent video. And that's problematic for me. And I do think that you had no way of knowing that Mrs. Day was going to come in and request not to sit at the table. So I give some creedance [sic] to that and I think that's -- I think it was wise of you. I think it was a worthwhile risk to say let's try to get someone. But it's axiomatic for

me to say -- to, at this point, to do anything other than exclude this evidence. And here's why, this is -- and everybody said it everytime they put a witness on the stand. It's been five years, four and a half years. In four and a half years you couldn't go and get some video prior to the close of discovery of her going to Ross or getting in a sedan or riding a bike or riding a horse. Yes, if that video shows that, then maybe she did give some questionable testimony, but we had this hearing the day -- the morning of trial or right before trial -- right before trial, but the week before trial about the video. And I said, I wasn't as concerned with the glitchy nature of it because it was glitchy. It wasn't high quality. The plaintiff didn't have an opportunity to investigate it, to challenge it's [sic] veracity. The same as here. They would have to basically have time to challenge the veracity of the video and see whether certain parts should be excluded. There's a lot that would have to be done that would delay this case and that would be unduly fair, unduly unfair. I mean, it's just -- it would just be unfair to ask the plaintiff now to prepare for even a dishonest client, if that is what the video would show. Because four years ago you could have decided that she was being dishonest. Someone -- or I'm -- or two years ago or whenever you and Mr. Green and Mr. Ormsby got involved with the case. You could have got a investigator on her and I'm sure you would have seen her riding a horse if that's the truth. It's just not going to work at this point. I find that it'd be nonsensical and inconsistent with my Pretrial Order to now let surveillance in. And I said surveillance couldn't come in on December 15th and when we had our last hearing. And you guys were aware and I do note that that was the primary basis for the -- for no opposition from the plaintiffs. And you guys were gracious to Mr. Jones. Thank you, Mr. Jones, you said to me on the phone, "thank you, Mr. Jones, I appreciate", Mr. Ormsby, you were telling me, I appreciate him being thoughtful that you had gone through Ida, nobody is going to try to come back in the eighth hour with additional information. And, yeah, you didn't see this coming, but you said we're closing discovery, we're not going to expand upon what everybody has been preparing for for all these years. So, for that reason, it'd be unduly fair, it'd be unfair for the plaintiff not to have an opportunity to investigate and, otherwise, check the veracity of the video. I think in interest of fundamental fairness, I must exclude not only the video, but the testimony of Mr. Jody Clavia [sic].

The trial court cited the delay that would have been caused by admission of the evidence, the agreements made among the parties when the trial was postponed for Prime Insurance's attorney, and the last-minute production of this evidence in the middle of the trial. Given the broad discretion afforded the trial court in ruling

on the admissibility of evidence, we cannot say the trial court erred in excluding admission of either the surveillance video or the testimony of Mr. Clavier.

## CONCLUSION

The motion to strike is denied. The judgment of the trial court is affirmed. Costs of this appeal are assessed equally to Terry Graham Trucking, Inc. and Prime Insurance Company.

**AFFIRMED.**